UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT CAPALDO, YOHENNA BORRERO,
and JUSTIN KOHLMEIER,

                         Plaintiffs,

            v.

REMINGTON LONG ISLAND EMPLOYERS,
REMINGTON HOTELS LLC, HHC TRS FP
PORTFOLIO LLC, and HYATT FRANCHISING,
LLC,

                         Defendants.

---

**MEMORANDUM AND ORDER**

18-CV-2746 (LDH) (AYS)

LASHANN DEARCY HALL, United States District Judge:

Robert Capaldo, Yohenna Borrero, and Justin Kohlmeier ("Plaintiffs") bring the instant action against Remington Long Island Employers, Remington Hotels LLC, HHC TRS FP Portfolio LLC, and Hyatt Franchising, LLC ("Defendants") for violations of state and federal law.  Capaldo and Borrero assert claims for workplace sex harassment under Title VII of the Civil Rights Act of 1964 ("Title VII") and New York State Human Rights Law ("NYSHRL"). Capaldo, Borrero, and Kohlmeier assert claims for retaliation under Title VII and the NYSHRL. Capaldo additionally asserts claims for unpaid overtime under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") and spread of hours pay under the NYLL. Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all of Plaintiffs' claims.

# UNDISPUTED FACTS[1]

Plaintiffs are each former employees of Remington Long Island, which manages the Hyatt Regency Long Island in Hauppauge, New York (the "Hotel"). (Defs.' Reply 56.1 Statement Supp. Mot. Sum. J. ("Defs.' Reply 56.1") ¶¶ 1, 173, 283.)

Capaldo was employed at the Hotel as chief engineer from approximately August 2, 2016, through March 8, 2018. (*Id.* ¶¶ 1, 160.) As chief engineer, Capaldo was responsible for the Hotel's physical plant, the general condition of the building, and maintenance of the Hotel's "assets," including mechanical equipment. (*Id.* ¶¶ 11–13.) Throughout his employment, Capaldo managed three full-time engineers and two part-time engineers, whom he trained twice per week concerning performance of various repairs around the Hotel. (*Id.* ¶¶ 16, 20.) Capaldo also participated in the Hotel's "Manager on Duty" program, through which he served as manager-in-charge of the Hotel when the general manager was not on the premises. (*Id.* ¶ 26.) In November 2016, Capaldo began reporting to Woochan Kim, the Hotel's general manager. (*Id.* ¶ 2.)

---

[1] The foregoing facts are undisputed unless otherwise noted. Further, facts that were not contradicted by citations to admissible evidence are deemed admitted. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Plaintiffs attached to their opposition to Defendants' Rule 56.1 statement declarations from Capaldo, Borrero, and Kohlmeier that were authored after the close of discovery and receipt of Defendants' Rule 56.1 statement. The Court will not consider these declarations to the extent they contradict prior deposition testimony. *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Additionally, in a letter motion to strike, Plaintiffs argue the Court should strike the replies to Plaintiffs' opposition to Defendants' statement of facts. (*See* ECF No. 80.) Although some courts in this circuit may consider such replies, this Court does not. Indeed, this Court does not read Rule 56.1 of the Local Rules to contemplate replies to oppositions. Accordingly, Defendants' replies are stricken from Defendants' Reply 56.1 statement. Plaintiff also moves to strike Defendant's Exhibit V because it was produced in a "document dump," and because Defendants previously represented that they could not locate it. (*See* ECF No. 80.) Having reviewed the parties' submissions, the Court finds no evidence of willfulness, bad faith, or otherwise culpable conduct meriting sanction. *See Presser v. Key Food Stores Co-op., Inc.*, No. 01-CV-8059, 2006 WL 2038508, at *1 (E.D.N.Y. July 19, 2006), *aff'd*, 316 F. App'x 9 (2d Cir. 2009) (denying motion to strike exhibit even though exhibit was not produced in discovery at all). Accordingly, Plaintiffs' motion to strike Exhibit V is denied. The Court notes that it did not rely upon Exhibit V in making its determination, in any event.

Borrero was employed at the Hotel from March 18, 2012, until March 25, 2018. (*Id.* ¶¶ 173, 281.) Borrero was initially hired as a housekeeping supervisor but over time she received several promotions, the most recent of which was a promotion to executive housekeeper in August 2016. (*Id.* ¶¶ 173, 178.) Borrero began reporting to Kim in November 2016. (*Id.* ¶ 185.)

Kohlmeier was employed at the Hotel from July 17, 2017, until January 31, 2018. (*Id.* ¶¶ 283, 380.) Kohlmeier was hired as an assistant front office manager but was promoted to front office manager on November 25, 2017, subject to a 120-day probationary period. (*Id.* ¶¶ 283, 286.) Among other responsibilities, Kohlmeier was responsible for the front desk staffing schedule. (*Id.* ¶ 297.) Kohlmeier reported to Kim. (*Id.* ¶ 296.)

In May 2017, or sometime thereabout, the Hotel's Guest Service Scores ("GSS") began to decline. (*Id.* ¶¶ 32–33.) GSS are "very important to the Hotel's success." (*Id.* ¶ 29.) As such, Kim and the other managers, including Capaldo and Borrero, were under pressure to raise them. (*Id.* ¶ 186.) The Hotel's goal was to be in the top 25%. (*Id.* ¶ 30.) All Hotel operations managers, including Capaldo and Borrero, were placed on an action plan to improve the GSS. (*Id.* ¶¶ 32–34.) Nevertheless, the GSS continued to decline through September 2017. (*Id.* ¶ 32.)

## I.   Capaldo's Allegations

On approximately November 16, 2017, Kim and Blanca Dunleavy, the director of Human Resources ("HR"), "presented" Capaldo with a Performance Improvement Review ("PIR") amid concerns about his job performance and his failure to improve his department's GSS. (*Id.* ¶¶ 39, 43–45.) Kim explained to Capaldo that Capaldo's department's GSS had not improved and that Capaldo was not actively leading his team. (*Id.* ¶¶ 45, 473.) Kim also reprimanded Capaldo because Kim believed that Capaldo had not been personally inspecting rooms as he was

3

instructed to do in May 2017.  (*Id.* ¶¶ 129–31.)  Capaldo disagreed with the PIR and provided

Kim and Dunleavy an explanation for each issue they raised and advised that he had

corroborating emails.  (*Id.* ¶ 475.)  Ultimately, Capaldo refused to sign the PIR.[2]  (*Id.* ¶ 46.)

Dunleavy responded that she would investigate, but did not, however, indicate that Capaldo

would not be placed on the PIR.  (*Id.* ¶¶ 476–78.)  Nonetheless, because Capaldo did not hear

further about the PIR, and because he ultimately did not sign it, he proceeded under the

assumption that the PIR never took effect.  (*Id.* ¶ 478.)

At some point in December 2017, Kim and Dunleavy presented Capaldo with a PIR

follow-up memo due to his continued poor performance.  (*Id.* ¶ 47.)  Specifically, Kim discussed

with Capaldo the topics listed in the PIR follow-up memo, including the need to walk around the

building to protect, manage, and maintain the Hotel, as well as specific improvements, such as

replacing showerheads, bathtubs, and a generator tank.  (*Id.* ¶ 49.)  Capaldo disputes that he was

presented with the PIR follow-up memo, but acknowledges that he met with Kim and Dunleavy

in December 2017 to discuss his performance.  (*Id.* ¶¶ 47, 482.)  According to Capaldo, at the

meeting, Kim told him that the GSS action plan "was done," congratulated him, and stated, "you

got out of it, everything is okay."  (*Id.* ¶ 481.)

On or about December 12, 2017, Kim went into Capaldo's office and told Capaldo that

he wanted to show Capaldo something.  (*Id.* ¶ 383.)  When Capaldo and Kim tried to exit

Capaldo's office together, they bumped into each other.  (*Id.*)  According to Capaldo, Kim then

leaned into his face and tried to kiss his lips.  (*Id.*)  Capaldo pushed Kim back and said,

"Woochan, what are you doing?"  (*Id.* ¶¶ 384.)  Kim responded, "oh, I'm sorry" and walked out

---

[2] Capaldo's declaration dated August 10, 2020, asserts that he was never asked to sign the PIR.  But at his deposition, he testified that he did not recall whether he was asked to sign it.  Because the declaration contradicts Capaldo's deposition testimony, the Court declines to consider it.

of Capaldo's office.  (*Id.*)  Defendants dispute that Kim tried to kiss Capaldo.  (*Id.* ¶¶ 66–68, 383–84, 386.)

On or about January 13, 2018, Kim expressed to Jeffrey Obomeghie, Defendants' divisional vice president and Kim's direct supervisor, Kim's continued dissatisfaction with Capaldo's performance, that Capaldo was on a PIR, and that Kim had presented Capaldo with a PIR follow-up memo.  (*Id.* ¶¶ 28, 55, 484.)  On January 16, 2018, Kim sent a draft of Capaldo's termination memo to Dunleavy for her review.  (*Id.* ¶ 56.)

On January 19, 2018, Kim and Dunleavy held a managers' outing (the "Managers' Outing") at a sushi restaurant.  (*Id.* ¶ 231.)  Borrero, Dunleavy, Kim, and others attended.  (*Id.*)  After the dinner, Borrero, Kim, Dunleavy, and two others decided to go to a karaoke bar.  (*Id.* ¶ 232.)  At the time, Capaldo was working as the manager on duty at the Hotel.  (*Id.* ¶ 390.)  At 8:51 p.m., Kim summoned Capaldo to the karaoke bar.  (*Id.* ¶¶ 390–91.)  According to Capaldo, when he arrived, Kim greeted him at the door by hugging him, kissing him, rubbing his hair, and touching his ear.  (*Id.* ¶¶ 73, 394.)  Capaldo gently pushed Kim away, and said, "okay, that's enough thank you."  (*Id.* ¶ 395.)  Capaldo did not believe that Kim's behavior was sexual.  (*Id.* ¶ 73.)  After greeting Capaldo, Kim grabbed Capaldo's hand and tried to walk him through the crowd.  (*Id.* ¶¶ 74, 396.)  Capaldo pulled his hand away and said, "Woochan, I can walk myself, thank you," but Kim kept grabbing at his hand and eventually dragged him by his wrist over to a table.  (*Id.* ¶¶ 74, 396–398.)  While they were seated at the table, Kim put his arm over Capaldo's shoulder and fondled Capaldo's right ear.  (*Id.* ¶¶ 77, 399.)  Capaldo moved Kim's hand away and asked Kim to stop, which he did for a few minutes, but Kim started fondling Capaldo's ear again.  (*Id.* ¶¶ 77, 400–01.)  Capaldo again grabbed Kim's hand and told Kim to stop.  (*Id.* ¶ 402.)  Nonetheless, Kim moved very close to Capaldo such that their legs were touching.

(*Id.* ¶ 403.)  Kim was "almost sitting on top of Capaldo." (*Id.*)  Capaldo tried to move but there was no room on the seat.  (*Id.*)  Kim put both hands on Capaldo's shoulders, moved inches from Capaldo's face and said, "I love you man, you could never leave me." (*Id.* ¶ 404.)  Kim then began leaning on Capaldo and rubbing his shoulders.  (*Id.* ¶ 405.)  Capaldo leaned over to Dunleavy, who was sitting near them, and said, "[Dunleavy], are you going to allow this to happen?" (*Id.* ¶ 406.)  Dunleavy ignored him.  (*Id.*)  At that point, Kim started rubbing Capaldo's left thigh, and Capaldo asked him to stop and moved Kim's hand.  (*Id.* ¶¶ 407–08.)  Kim stopped for a short time, but soon began rubbing Capaldo's thigh again, and moved his hand close to Capaldo's penis.  (*Id.* ¶ 409.)  Capaldo pushed Kim away again, after which Kim said, "I'm the general manager, I can do what I want." (*Id.* ¶ 410.)  Capaldo responded, "no you can't," and then got up from the table and walked behind the booth.  (*Id.* ¶ 411.)  Kim followed Capaldo behind the booth, grabbed Capaldo by the hips and started rubbing his penis against Capaldo's buttocks, simulating anal sex.  (*Id.* ¶¶ 79, 412.)  Capaldo then pushed Kim against the wall and said, "I've had it, that's enough." (*Id.* ¶¶ 80, 413.)  As Capaldo was getting ready to leave, he said to Dunleavy, "I can't believe you are allowing this." (*Id.* ¶ 414.)  Dunleavy looked at Capaldo and laughed.  (*Id.* ¶ 414.)  Defendants dispute Capaldo's account of the Managers' Outing.  (*Id.* ¶¶ 394–418.)  Following the outing, Capaldo's subordinates, other Hotel employees, and at least one outside vendor made comments and jokes about the incident.  (*Id.* ¶¶ 418–20.)  Capaldo ultimately sought therapy concerning Kim's conduct. (*Id.* ¶ 422.)

On January 25, 2019, Morales met with Capaldo in his office, where they discussed the Managers' Outing and Capaldo's other grievances.  (*Id.* ¶ 90.)  Morales asked Capaldo to document his grievances in a written statement.  (*Id.* ¶ 91.)  Capaldo provided Morales with a written statement on January 27, 2018.  (*Id..*)  The day before, on January 26, 2018, Morales and

Obomeghie called Kim and informed him that he was suspended pending an investigation.  (*Id.* ¶ 104.)  On or about January 31, 2018, following interviews with multiple employees, including Borrero and Kohlmeier, Kim was reinstated.  (*Id.* ¶¶ 122–123.)  On February 7, 2018, Morales and Obomeghie met with Kim and gave him a final warning document, so that Kim could review it and respond.  (*Id.* ¶ 123.)  The final warning stated, "some team members have complained that you have made unwanted, physical contact with them[,]" that Kim did not deny such contact, and that Kim stated he is "affectionate by nature and that it is customary for [him] to hug, kiss, or touch, as a display of affection, or in greeting."  (*Id.* ¶ 451.)  The final warning also stated that Kim "strongly denied that there has even been any sexual undertone associated with [his] behavior."  (*Id.*)  The following day, Kim emailed a signed copy of his final warning, with responses to the allegations, to Morales and Obomeghie.  (*Id.* ¶ 124.)  Specifically, he wrote "Thank you and [Morales] for the support . . . . I am really hoping that you do protect me from any future accusations by these dishonest managers as this document says final warning that I do not deserve to have and that was the reason I was very hesitant to sign."  (*Id.* ¶ 451.)

Meanwhile, on February 7, 2018, Morales decided with Obomeghie that Capaldo would be placed on an extended PIR for 30 days.  (*Id.* ¶ 125.)  The next day, Kim and Obomeghie met with Capaldo to discuss the extended PIR.  (*Id.* ¶¶ 126–27, 485.)  Kim and Obomeghie reiterated that Capaldo he needed to inspect ten rooms per day, and could not delegate that task to others.  (*Id.* ¶¶ 126–131, 487.)  The extended PIR required that Capaldo's performance be monitored on a weekly basis.  (*Id.* ¶ 488.)

On February 28, 2018, Kim reviewed key lock interrogation reports (the "Reports") and discovered that Capaldo had not been personally inspecting rooms.  (*Id.* ¶¶ 135–141.)  Specifically, the Reports demonstrated that Capaldo's key had been used to enter multiple rooms

at the same time, that the inspections took less time than required, and that Capaldo had not entered rooms he claimed he inspected.  (*Id.*)  The same day, Kim emailed Obomeghie regarding the Reports, to which Obomeghie responded, "[l]et's discuss."  (*Id.* ¶ 501.)  After a phone call between Kim and Obomeghie, Kim emailed Obomeghie that he attempted to get more information from the key card company, but it did not provide the information he "was looking for," so he spoke with Trevor Anderson, one of Capaldo's subordinates, to confirm that Capaldo had not been inspecting rooms.  (*Id.* ¶¶ 154, 502.)  Kim reported to Obomeghie that Anderson confirmed that Capaldo had been giving Anderson his key to inspect rooms "for a while."  (*Id.* ¶¶ 154, 503.)

On March 1, 2018, Obomeghie recommended to Morales that Capaldo be suspended and terminated for insubordination.  (*Id*. ¶ 155.)  Obomeghie reported to Kim in an email that Capaldo was suspended and that "we may need to have [Anderson] do a written statement or sign the statement that he gave."  (*Id.* ¶ 510.)  Obomeghie suggested that Anderson could either "write his statement in his own handwriting and sign it or he could have someone write it for him and he reads it and signs."  (*Id.*)  Later that day, Dunleavy sent to Obomeghie and Morales a statement, purportedly signed by Anderson (the "Anderson Statement"), attesting to Capaldo's delegation of room inspections.  (*Id.* ¶ 158.)  Capaldo maintains that Anderson did not author or sign the Statement.  (*Id.* ¶ 509.)  Anderson testified that Kim and Dunleavy asked him to sign the Statement, but he refused, and he specifically told them that he was not inspecting rooms for Capaldo.  (*Id.* ¶ 508.)

The same day, Kim and Dunleavy met with Capaldo to advise him that he was suspended, which was without pay.  (*Id.* ¶¶ 159, 511–12.)  Obomeghie and Morales agreed that

Capaldo should be terminated.  (*Id.* ¶¶ 156–57, 161.)  One week later, on March 8, 2018, Kim and Dunleavy advised Capaldo that his employment had been terminated.  (*Id*. ¶ 160.)

## II.   Borrero's Allegations

Borrero claims that Kim began to engage in inappropriate conduct toward her in early 2017.  In February of that year, Kim and Borrero exchanged text messages.  (*Id.* ¶ 193.)  In one such exchange, Borrero joked that she might resign her employment, to which Kim responded, "[y]ou are not allowed to go nowhere without my approval.  You are mine."  (*Id.*)  At some point later in 2017, Kim told Borrero, "you know I like you" and "you know I love you."  (*Id.* ¶ 196.)  Borrero claims that Kim also sent her a message that made "some reference to [Kim] being something to [Borrero] 'unless you want me to be something else with you.'"  (*Id.* ¶ 439.)  Borrero claims she subsequently shared the text message with Dunleavy, who responded that she believed Kim had feelings for Borrero.  (*Id.* ¶ 440.)  Defendants deny Kim sent a text message suggesting he be "something else" to Borrero, and Borrero failed to produce it.  (*Id.* ¶ 439.)  Defendants further deny that Borrero shared any such text message with Dunleavy or that Dunleavy told Borrero that Kim had feelings for her.  (*Id.* ¶ 440.)  Sometime in the summer of 2017, Borrero, Kim, and Dunleavy met at a local restaurant where, according Borrero, Kim "kind of lost control" and was "very touchy."  (*Id.* ¶ 201.)  Defendants deny that Kim acted inappropriately at the restaurant.  (*Id.* ¶ 202.)

On November 18, 2017, Kim met with Borrero in his office where he informed her that he took her off her action plan, even though her department's GSS remained low.  (*Id.* ¶ 203.)  Kim then stated, "[d]on't think that I am always nice like this, I can be bad with whoever I want whenever I want, but I am doing this because I love you[,]" and, "[o]h you work very hard, but you are not making your numbers.  Don't think I am doing this because you are beautiful and

you lost 20 pounds." (*Id.* ¶¶ 203–204.) Before Borrero left the office, Kim hugged her and said, "[y]ou have no idea how bad this was. I spent all night drinking." (*Id.* ¶ 205.)

After the meeting with Kim, Borrero texted and called Dunleavy and told her what happened. (*Id.* ¶ 206.) Dunleavy responded, "if you want to make a formal complaint, it's all up to you." (*Id.*) Borrero claims that she further expressed concern that Kim would retaliate against her if she made a complaint. (*Id.*) Dunleavy responded, "[w]ell that's true" and proposed that Dunleavy, Borrero, and Kim sit down and discuss Borrero's complaint. (*Id.*) Borrero declined. (*Id.*) Defendants dispute that Borrero ever complained to Dunleavy concerning Kim's alleged conduct or that the two discussed making any formal complaint against Kim. (*Id.* ¶¶ 210, 424.) Borrero also sent Kohlmeier a text about the meeting with Kim. (*Id.* ¶ 212.) Borrero told Kohlmeier that Kim was drunk and made her cry. (*Id.*) She wrote, "[a]t the beginning he said that everybody is getting action plan, [b]ut not me, [b]ecause he loves me and [knows I] work very hard." (*Id.*) She further wrote that Kim said he "is very good doing bad things to people," and that his attitude was "[o]hhh [I] love you, [b]ut I hate you. Ohhh you are good but you are bad." (*Id.*)

A few hours after the meeting, Kim went to Borrero's office and asked Borrero what time she would be finished working because he wanted to see if Borrero wanted to go out. (*Id.* ¶ 425) Borrero responded that she did not know and that she had many things to do. (*Id.*) Later that day, Borrero went to Kim's office to have Kim sign a purchase order, and while she was there, Kim asked Borrero, in the presence of Kohlmeier and another employee, "Oh, what time? Where? Tell me." (*Id.* ¶ 426) Borrero did not respond, left Kim's office, and called Dunleavy. (*Id.* ¶ 427.) Borrero claims that she expressed to Dunleavy her concern that the other employees would think that she was in a relationship with Kim and that the relationship was the reason she

10

was placed in her position.  (*Id.* ¶ 428.)  Borrero also discussed Kim with Kohlmeier, who told

her to calm down.  (*Id.* ¶ 217.)  Although, Defendants do not dispute Borrero's account of what

occurred between her and Kim, they dispute that Borrero had any conversation with Dunleavy

about it.  (*Id.* ¶¶ 427–28.)

        In addition to the in-person interactions, Kim also texted Borrero that day.  (*Id.* ¶ 219.)

Specifically, Kim sent Borrero a text message again asking what time Borrero would be finished

working so that they could go out.  (*Id.*)  At 1:59 p.m., Kim texted Borrero "What time finish?"

(*Id.*)  At 6:43 p.m., Kim texted her, "[w]here?" then, at 9:29 p.m., "[a]re you okay?"  (*Id.*)  At

9:34 p.m., Borrero responded that she was fine, and that she had left the Hotel to run errands

with her mom.  (*Id.*; Ex. O at 4,[3] Warsaw Decl., ECF No. 70-15.)  Kim responded, "Good night."

at 9:45 p.m.  (Defs.' Reply 56.1 ¶¶ 219–220.)  Kim asserts that each of these text messages were

work related, and did not concern going out to drinks.  (*Id.* ¶ 220.)

        On December 28, 2017, Dunleavy, Kim, Borrero, Capaldo, and another manager

gathered at a local pizzeria to celebrate their positive Associate Opinion Surveys.  (*Id.* ¶ 221.)

Before departing, Borrero ordered a pizza to take home.  (*Id.* ¶ 222.)  Kim then announced,

"[e]verybody can leave. I will stay here with [Borrero]."  (*Id.* ¶¶ 222, 431.)  In response, Borrero

sent a text message asking Dunleavy not to leave her.  (*Id.* ¶ 432.)  Everyone waited with

Borrero.  (*Id.* ¶¶ 225, 443.)  While they were waiting, Kim hugged Borrero and put his arm

around her.  (*Id.*)  Two days later, on December 30, 2017, Kim asked Borrero to help him with

an employee who was crying.  (*Id.* ¶ 436.)  Thereafter, Kim asked if he and Borrero could speak

more about the crying employee, "but not here."  (*Id.* ¶ 437.)  Borrero and Kim then went to a

restaurant.  (*Id.*)  There, Kim stated to Borrero, "I want you to be on my side, and I want you to

_____

[3] Citations to Exhibit O refer to the ECF page numbers.

know that with me, you can get very far.  Look where I am.  I don't speak a hundred percent English.  [Obomeghie] knows you because of me because I speak about you all the time to him." (*Id.* ¶ 229.)  The next morning, on December 31, 2017, Kim texted Borrero asking if she slept well, and if she was happy.  (*Id.* ¶ 230.)  Borrero responded, "I am happy . . . want more money and bonus later, but I am very happy.  That's for sure.  I love my job."  (*Id.*)  Kim then asked Borrero if she was happy with him and she wrote, "of course."  (*Id.*)

Like Capaldo, Borrero attended the Managers' Outing.  (*Id.* ¶ 231.)  Borrero maintains that after the dinner, when the group decided to go to a karaoke bar, one of the other managers asked whether she would be riding with them.  (*Id.* ¶ 443.)  Kim responded, "no, [Borrero] is leaving with me."  (*Id.*)  Dunleavy and Borrero responded that Borrero would ride with Dunleavy.  (*Id.*)  Defendants dispute that this exchange occurred.  (*Id.*)  In any event, at the bar, the group sat around a table.  (*Id.* ¶ 233.)  While there, Kim laid his head on Borrero's shoulder, and told her that he loved her.  (*Id.* ¶¶ 445–46.)  Borrero claims she "tried to get away" but did not want to be rude.  (*Id.* ¶ 447.)  Borrero also witnessed Kim touch Capaldo's leg, play with his hair, and get "too close" to Capaldo's ear.  (*Id.* ¶¶ 81, 234.)  At some point, Dunleavy said to Borrero, "let's go, [Kim] is getting out of control."  (*Id.* ¶ 448.)  While Borrero and Dunleavy were walking to their cars to leave, Kim came between them in the parking lot and put his arms around them.  (*Id.* ¶ 449.)

On January 25, 2018, Borrero complained to Morales about the Manager's Outing, comments made by Kim, the text messages Kim sent to Borrero, and the November 18, 2017 meeting with Kim.  (*Id.* ¶¶ 244–46.)  In response, Morales asked Borrero to send her a written statement, which Borrero did on January 27, 2018.  (*Id.* ¶¶ 248, 251.)

According to Borrero, Dunleavy and Kim became "overly critical" of her department after she met with Morales and submitted her written statement. (*Id.* ¶ 255.)  In particular, on or about January 31, 2018, Dunleavy informed Borrero via email (copying Borrero's subordinates) that Morales was disappointed that there was no music and exercise during housekeeping meetings, as there had been previously. (*Id.* ¶¶ 257, 521–22.)  Borrero forwarded the email to Morales, and told Morales that she felt retaliated against for making a complaint. (*Id.* ¶ 259.) Morales advised Borrero that Borrero's complaint was confidential, and that Morales's comment about the housekeeping meeting was "more of a joke, not a directive." (*Id.* ¶¶ 263, 266.)  In addition, after Borrero's complaint, Kim copied Dunleavy on every email that he sent to Borrero, revised Borrero's housekeeping schedules, and attended at least one of Borrero's morning meetings. (*Id.* ¶¶ 270–272.)  Dunleavy also began inspecting Borrero's rooms and attended some housekeeping meetings led by Borrero, but only inconsistently. (*Id.*)

Sometime in March 2018, Borrero began looking for another job. (*Id.* ¶ 273.)  On March 23, 2018, while the Hotel was under a general performance audit, Kim and Dunleavy met with Borrero to discuss an expectation memo. (*Id.* ¶¶ 274, 526.)  The memo directed Borrero to "have fun music and to do exercise with the girls at the morning[] housekeeping meetings," and to start executing her action plan immediately. (*Id.* ¶ 526.)  Borrero reviewed the memo and indicated she did not agree with its terms, but acknowledged and signed it, nevertheless. (*Id.* ¶ 278.)  Two days later, on March 25, 2018, Borrero resigned. (*Id.* ¶ 281.)

### III.   Kohlmeier's Allegations

On December 14, 2017, while still in his 120-day probationary period, Kohlmeier received from Kim and Dunleavy a written final warning for inappropriate workplace conduct and not following company policies. (*Id.* ¶¶ 305–307.)  Among other things, the final warning

stated that Kohlmeier had written his initials on female co-workers' hands, wrote his phone number on another co-worker's arm, spent too much time wandering the Hotel rather than managing the front desk, changed the front desk computer wallpaper to a photograph of himself, distracted co-workers while they were supposed to be working, did not train staff, and showed favoritism toward certain staff members.  (*Id.* ¶ 308.)  The final warning stated that Kohlmeier's failure to make immediate changes to his conduct could result in further disciplinary action, up to and including termination of employment.  (*Id.* ¶ 309.)  The same day, Kohlmeier received a second final warning regarding his performance as the front office manager, which made note of Kohlmeier's failure to be present, engage with guests, lead his team, notify Kim or Dunleavy and his team when Kohlmeier needed to be off the property, or to set expectations with his team so they understood their goals.  (*Id.* ¶¶ 312–13.)  Kim warned Kohlmeier that any insubordinate behavior, including defiant or challenging remarks, would not be tolerated, and explained that Kohlmeier's neglect of his duties could result in termination of his employment.  (*Id.* ¶ 315.)

Kohlmeier, who was generally aware of Kim's incidents with Borrero and Capaldo, complained three times about Kim's conduct.  He did so once on January 9, 2018, in a written statement to Dunleavy, asserting that he was concerned about Kim's behavior, and that the Hotel had become a hostile work environment.  (*Id.* ¶¶ 338–40.)  The second time, on January 20, 2018, Kohlmeier emailed Morales to follow up on his written statement, and stated again that the Hotel had become a hostile work environment for him and his team.  (*Id.* ¶¶ 356–57.)  And, he complained a third time during a meeting with Morales on January 25, 2018, when he informed her of other employees' complaints to him about Kim's conduct.  (*Id.* ¶¶ 363–64.)

On January 25, 2018, at 5:45 p.m., Kohlmeier prepared and submitted to Kim a schedule for front office employees.  (*Id.* ¶ 547.)  By around 8:00 p.m., Kohlmeier had not received any

feedback from Kim concerning the schedule.  (*Id.* ¶ 549.)  Nonetheless, Kohlmeier sent the schedule to the employees.  (*Id.* ¶¶ 550–51.)  After the schedule posted, Kim emailed Kohlmeier, asking him to "[p]lease schedule yourself as follows as we first discussed:  Sat pm, Sun am, Mon off . . ."  (*Id.* ¶ 552.)  Kohlmeier did not respond or otherwise seek to speak with Kim further concerning the schedule.  (*Id.* ¶ 369.)  The next day, Kim followed up via email, noting that Kohlmeier posted the schedule without Kim's changes.  (*Id.* ¶ 370.)  Kohlmeier responded that the schedule accommodated two supervisors' previously approved time-off requests.  (*Id.* ¶¶ 371, 557.)  On January 26, 2018, Kim responded to Kohlmeier's email, copying Dunleavy, stating, "I, you[r] direct supervisor, requested you to change [the schedule] but you do not want to.  You neglected my request, never responded me back and posted as it was.  I am taking this as an insubordination and will follow up with you later."  (*Id.* ¶¶ 372, 567.)  A few days later, on February 1, 2018, Kim sent the exchange to Obomeghie, who forwarded it to Morales and noted that it was a clear case of insubordination.  (*Id.* ¶ 569.)  Although Morales had concerns that the termination might appear retaliatory because of Kohlmeier's complaint about Kim, she concluded that there was a strong case of insubordination.  (*Id.* ¶ 378.)  Obomeghie likewise believed that the case for termination was strong.  (*Id.* ¶ 379.)  Morales and Obomeghie met with Kohlmeier on January 31, 2018, and advised him that his employment was terminated.  (*Id.* ¶ 380.)

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I.  Sexual Harassment Under Title VII and the NYSHRL

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1); *see also Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017). In asserting a sex harassment claim under Title VII, a plaintiff may proceed under two theories: *quid pro quo* harassment and hostile work environment. *Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 456 (E.D.N.Y. 2011) (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994)). More specifically, "[c]ases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome

attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work

environment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998).

### A. Hostile Work Environment

"A hostile work environment exists 'when the workplace is permeated with disciplinary

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'" *Domingo v. Avis Budget*

*Grp., Inc.*, No. 18-CV-5430, 2020 WL 804898, at \*2 (E.D.N.Y. Feb. 18, 2020) (quoting *Mormol*

*v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004)).  To prove a hostile work

environment claim under Title VII, "the misconduct shown must be 'severe or pervasive enough

to create an objectively hostile or abusive work environment,' and the victim must also

subjectively perceive that environment to be abusive." *Agosto v. N.Y.C. Dep't of Educ.*, 982

F.3d 86, 101–02 (2d Cir. 2020) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).[4]

To meet this standard, "[t]he incidents typically 'must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive." *Id.* at 102.  And, while a

single incident may be actionable, "it must be 'extraordinarily severe.'" *Id.* (quoting *Desardouin*

*v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).

To be sure, that "the law requires harassment to be severe or pervasive before it can be

actionable does not mean that employers are free from liability in all but the most egregious

cases." *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997).  "Whenever the harassment is of

such quality or quantity that a reasonable employee would find the conditions of her employment

altered for the worse, it is actionable under Title VII, so long as the employee subjectively

experienced a hostile work environment." *Id.* at 632.  Not surprisingly, "[t]he line between

---

[4] Hostile work environment claims under Title VII and NYSHRL are governed by the same standard and therefore the Court analyzes the claims together.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013).

complaints that are easily susceptible to dismissal as a matter of law and those that are not is

indistinct." *Redd v. New York Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012). The Second

Circuit has explained that one side of the line includes "casual contact that might be expected

among friends . . . in the absence of aggravating circumstances such as continued contact after an

objection," and on the other side, "direct contact with an intimate body part." *Id.* (citations and

emphasis omitted). Importantly, "when the physical contact surpasses what (if it were

consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult

to write the conduct off as a pedestrian annoyance." *Id.* (citation and emphasis omitted).

### 1. Capaldo's Hostile Work Environment Claim

Capaldo's hostile work environment claim is premised upon two incidents: the alleged

attempt by Kim to kiss Capaldo on the lips in December 2017 and Kim's conduct toward

Capaldo at the Managers' outing. (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 19,

ECF No. 68; Pls.' Opp'n Summ. J. ("Pls.' Opp'n") at 9–10, ECF No. 71.) As a threshold matter,

Defendants maintain that Capaldo effectively conceded that the attempted kiss was no more than

a misunderstanding and therefore does not provide a basis for his claim. (*Id.*) Nonsense.

Defendant's purported support for this contention is based on a complete misstatement of the

record that the court rejects outright. (*See* Defs.' Reply 56.1 ¶¶ 65–68.) Capaldo's testimony

establishes only that he "didn't want to believe" that Kim tried to kiss him, and that he does not

"like to accuse" others so he "let it go." (*Id.* ¶ 66.) This is hardly the "concession" Defendants

urge it to be. The alleged kiss remains ripe for consideration.

Next, Defendants argue that Capaldo's allegations concerning Kim's conduct at the

Managers' Outing also fail to support his claim because, in Defendants' estimation, "no

reasonable jury would credit Capaldo's version of events." (Defs.' Mem. at 19.) Specifically,

Defendants maintain that Capaldo's testimony is inconsistent because "[i]t was not until [his] deposition that he claimed . . . that Kim touched his crotch or rubbed his penis against him," and because "none of the others present—including co-Plaintiff Borrero—corroborated Capaldo's serious allegations that Kim touched his crotch or rubbed his penis against him."  (*Id.*)  *First*, the Court does not discern any inconsistent statement by Capaldo.  That is, at most, Capaldo's prior statements were incomplete, not contradictory.  And, Capaldo provided a plausible explanation for not sharing the most serious allegations:  "[H]e was 'very humiliated and disheartened by the events . . . and it was extremely hard for [him] to discuss [them] openly[.]'"  (Pls.' Opp'n at 12–13, ECF No. 71 (citing Defs.' Reply 56.1 ¶ 467).)  Moreover, by their argument, Defendants invite the Court to engage in a credibility inquiry, which is generally disfavored on a motion for summary judgment.  *See Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) ("[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . for these are jury functions, not those of a judge." (internal quotation marks and citation omitted)).  Indeed, the very authority relied upon by Defendants makes plain that district courts should not "routinely engage in searching, skeptical analyses of parties' testimony," and that if there is a "plausible explanation"—as there is here—the district court "should not disregard the later testimony because an earlier account was . . . simply incomplete." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011).  *Second*, Defendants' contention that none of the other employees present corroborated Capaldo's "serious allegations" that Kim touched Capaldo's crotch or rubbed his penis against Capaldo's buttocks is only correct if one ignores Borrero's deposition.  Borrero testified that she saw Kim touch Capaldo's leg, play with Capaldo's hair, and "get[] too close to his ear."  (Defs.' Reply

19

56.1 ¶¶ 81, 234.)  For the purpose of this motion, Borrero's testimony, coupled with Capaldo's version of events, is sufficient to raise a triable issue for the jury.

Defendants argue next that summary judgment is appropriate because Capaldo alleges only episodic or isolated instances of harassment, which "do not amount to objectively severe and pervasive conduct."  (Defs.' Mem. at 19–20.)  At the outset, it appears that Defendants misapprehend the legal standard applied to hostile work environment claims.  Contrary to Defendants' argument, a plaintiff need not adduce evidence that the conduct was both "severe and pervasive; instead, a plaintiff need only demonstrate that the conduct was 'severe *or* pervasive.'"  *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original) (reversing a grant of summary judgment, finding that a "trier might easily find that the harassment and abuse was sufficiently severe" alone)*.*  And, here, Capaldo has alleged conduct that is sufficiently severe to overcome summary judgment.  Capaldo testified that Kim "rubb[ed] his left thigh" multiple times, "just about touched [his] penis, and touched his crotch on the outside of his clothing," and "grabbed [Capaldo's] hips, and rubbed his penis against Capaldo to simulate anal sex."  (Defs.' Reply 56.1 ¶ 79.)  This is precisely the sort of conduct that "surpasses what (if it were consensual) might be expected between friendly coworkers" and cannot be written off.  *See Redd*, 678 F.3d at 177, 180 ("Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment").  Incredibly, Defendants ignore these facts, focusing instead only upon Capaldo's allegation that Kim attempted to kiss Capaldo.  This is telling.  A reasonable jury could find that the incident at the Managers' Outing, particularly the simulation of anal penetration, was sufficiently severe so as to alter the conditions of Capaldo's employment.  *See Agosto*, 982 F.3d at 102 (describing allegation of a "simulated act of anal penetration" was "a serious charge," but dismissing the

20

claim because the allegation was "contradicted by [the plaintiff's] own sworn affidavit");

*Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 520–21 (S.D.N.Y. 2000) (holding

that a single instance of harassment was sufficiently severe where coworker "wrapped his arms

around [plaintiff], grabbed her in a bear hug, made a grunting sound, and slapped her left buttock

three times"); *see also Howley v. Town of Stratford*, 217 F.3d 141, 154–55 (2d Cir. 2000)

(reversing summary judgment even though the employee made no physical contact with plaintiff

firefighter lieutenant but engaged in a single, vulgar tirade that undermined her ability to lead in

life-threatening circumstances). Nothing more is required.

Notably, the cases cited by Defendants in support of dismissal are inapposite. They each

involve touching of a non-sexual nature or touching that was otherwise not actionable in light of

the context.[5] (Def's Mem. at 19–20.) In *Perry v. Slensby*, for example, the court determined that

the co-worker's vulgar comment and brief massage were not objectively hostile because

"[p]laintiff himself testified . . . employees joked with each other, used vulgar and sexual

language with each other, talked about sex with each other, and put their hands on each other."

No. 16-CV-8947, 2019 WL 3409894, at *5 (S.D.N.Y. July 29, 2019). There is no evidence here

suggesting that it was routine for Hotel employees to kiss and touch each other in a sexual

manner, or to simulate sex acts. Although *Figueroa v. Johnson* involved a single instance of

thigh touching, that touch was not described as sexual, nor was there evidence that the employee

rubbed the plaintiff's thigh close to an intimate body part. *See* 109 F. Supp. 3d 532, 552–53

(E.D.N.Y. 2015); *see also Hsueh v. N.Y.S. Dep't of Fin. Servs.*, No. 15-CV-3401, 2017 WL

---

[5] Other cases cited by Defendants involved no touching at all. *See Chauca v. AdvantageCare Physicians, P.C.*, No. 18-CV-2516, 2019 WL 4247495, at *8 (E.D.N.Y. Sept. 6, 2019) ("four [inappropriate] comments and one gesture" between coworkers); *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 264–65 (E.D.N.Y. 2019) (coworker used no physical force or intimidation and did not make physical contact with plaintiff).

3671179, at **4–5 (E.D.N.Y. Aug. 24, 2017) (no evidence of physical contact with an intimate body part); *Geller v. N. Shore Long Island Jewish Health Sys.*, No. 10-CV-0170, 2013 WL 5348313, at *7 (E.D.N.Y. Sept. 23, 2013) (no evidence of physical contact with an intimate body part). In *Domingo v. Avis Budget Group*, *Inc*., the court determined that a brief grab of plaintiff's buttocks by a coworker was not severe because it "was isolated, occurred over a matter of seconds in a crowded office space, was not accompanied by any words, did not occur in front of others, and did not interfere with plaintiff's working conditions." 2020 WL 804898, at **3–4 (E.D.N.Y. Feb. 18, 2020). The Managers' Outing is comparatively more severe because it involved an intimate thigh-rub and anal sex simulation by a supervisor, occurred over multiple objections from Capaldo, was longer in duration, and occurred in public. *Cf. id.* (noting that the "allegation against [the employee] pales in comparison to instances where supervisors have made repeated physical contact with intimate body parts" and that the accused employee "did not have the authority to fire or discipline plaintiff, he did not place her in any physical harm, and she never reported the incident to her supervisor or HR."). Moreover, unlike in *Domingo*, Capaldo experienced teasing after the event from coworkers, subordinates, and vendors. While *Domingo* is somewhat factually similar, the Court cannot say that it necessitates dismissal of Capaldo's claim as a matter of law.[6]

---

[6] The Court declines to consider *Tomaya v. Hasaki Restaurant, Inc.*, given the lack of clarity in the holding. There, the court determined, without much analysis, that an "isolated" incident of a coworker rubbing his pelvis against the plaintiff's back was insufficient to support her claims. *See* No. 13-CV-4892, 2014 WL 7234602, at *4 (S.D.N.Y. Dec. 18, 2014). The court cited *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998), and noted in a parenthetical that "although the incident [in *Quinn*] was severe, [p]laintiff could not show that the harassment was also pervasive as the law requires." *Id.* Of course, the law requires showing one or the other, not both. *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010). It is unclear whether the court determined the incident to be "insufficient" because the plaintiff showed that the incident was only severe and not also pervasive.

Next, Defendants argue that Kim's alleged conduct had no impact on Capaldo's ability to work because, they assert, he "did not allege Kim's most serious touching until his deposition." (Defs.' Mem. at 21.)  Defendants overstate the record.  Although Capaldo may not have explicitly mentioned that Kim's thigh rubbing was close to his penis or that Kim simulated anal sex, he certainly mentioned the events generally in his January 27, 2018 complaint to human resources—only eight days after the incident.  Specifically, Capaldo noted that Kim "put his right hand on the inside of [Capaldo's] left thigh and started rubbing [his] thigh and moving higher" and, after Capaldo got up from the booth, Kim "followed [Capaldo] and began to touch [him] all over again." (*See* Ex. E, Goldring Decl., ECF No. 76-5.)  And, Capaldo eventually went to therapy after the incident.  (Defs.' Reply 56.1 ¶ 421.)  Moreover, Defendants' naked conclusion that "Kim's actions had no impact on Capaldo's ability to work" is belied by the record.  (*See* Defs.' Mem. at 21.)  Here, Capaldo explained that he was "physically sick and disgusted anticipating" working Kim," and that he was made fun of by co-workers, subordinates and outside vendors.  (Defs.' Reply 56.1 ¶¶ 417–21.)

Finally, Defendants assert that because Kim engaged in the same conduct with both male and female employees, he is an "equal opportunity" harasser.  (*See* Defs.' Mem. at 23 (citing *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 n.88 (2d Cir. 2019).)  Therefore, according to Defendants, Capaldo cannot meet his burden to show that "members of one sex are exposed to disadvantageous terms or conditions of employment . . . to which members of the other sex are not." (Defs.' Mem. at 20, 23–24).  Defendants ignore, however, that the Second Circuit flatly rejected this argument in *Brown v. Henderson*:  "[W]hile [similar treatment] does point to a relevant evidentiary consideration, [it] cannot, however, end the necessarily individualized and fact-sensitive inquiry" into why a victim was treated the way they were.  257 F.3d 246, 252 (2d

Cir. 2001) (affirming summary judgment where the true reason for harassment was a union leadership dispute, not plaintiff's sex). Indeed, the "inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved," because "what matters in the end is not how the employer treated *other* employees, if any, of a different sex, but how the employer *would have* treated *the plaintiff* had she been of a different sex." *Id.* at 253–54 (citation omitted) (emphasis in original). The conduct of which Capaldo complains is significantly more severe than what Borrero claims to have experienced and what other employees reported. Defendants have adduced no evidence that Kim touched the thighs of women inappropriately close to their intimate body parts or that he simulated anal sex with them. A jury could find based on this evidence that Kim harassed Capaldo "because of" Capaldo's sex.[7]

Capaldo's hostile work environment claim cannot be dismissed as a matter of law.

## 2. Borrero's Hostile Work Environment Claim

Defendants argue that Borrero's hostile work environment claim is ripe for dismissal because her allegations amount to mere episodic or isolated incidents of alleged harassment. (Defs.' Mem. at 21.) Here, the Court agrees.

---

[7] None of the Second Circuit cases Defendants cite require dismissal. The closest cases are *Fullwood v. Sodexo, Inc.* and *Russo v. New York Presbyterian Hospital.* In *Fullwood*, the court dismissed a sex harassment claim because the plaintiff failed to provide any evidence that the alleged harasser's conduct, friendly arm punching and vulgarity, was "because of" sex. *See* No. 16-CV-6527, 2018 WL 3439866, at *12 (W.D.N.Y. July 17, 2018). The court determined that the conduct and comments were not "because of" plaintiff's sex because the supervisor punched everybody the same way and because the plaintiff also used vulgar language in conversations with the alleged harasser. *See id. Fullwood* does not alter the Court's conclusion because the alleged conduct there was not sexual in nature, and because Capaldo experienced conduct different from female employees. In *Russo*, the plaintiff alleged a sex-based hostile work environment citing a vulgarity-filled tirade in an operating room. *See* 972 F. Supp. 2d 429, 448–49 (E.D.N.Y. 2013). The court determined that because the plaintiff's own testimony revealed that the comments were not sexual in nature and that the defendant directed the vulgarities at men too, dismissal was required. *Id.* As noted above, Capaldo's allegations stand in stark contrast because he alleges sexual touching that was different in kind from the treatment that women experienced.

Borrero has not adduced evidence of any pervasive conduct.  Rather, the incidents about which she complains can be rightly characterized as sporadic.  Borrero's claim is premised on the following:[8]

- At some point in 2017, Kim texted Borrero and asked if she wanted to be "something else" with him (Defs.' Reply 56.1 ¶ 439);

- At some point in 2017, Kim told her, "you know I like you" and "you know I love you" (*Id.* ¶ 196);

- On February 28, 2017, after Borrero made a joke about a resignation letter, Kim texted her "you are not allowed to go nowhere without my approval[.]  You are mine" (*Id.* ¶ 193);

- On November 18, 2017, Kim said "[d]on't think that I am always nice like this. I can be bad with whoever I want whenever I want, but I am doing this because I love you," and "[d]on't think I am doing this because you are beautiful and you lost 20 pounds."  (*Id.* ¶¶ 203–04.)  The same day, Kim sent a series of text messages in an apparent attempt to get drinks with Borrero.  (*Id.* ¶ 219);

- On December 28, 2017, at a managers' dinner, Kim said, "[e]verybody can leave[,] I will stay here with [Borrero]," and while Borrero waited to take a pizza home, "Kim came up to her, hugged her, got close holding his arm around her," and "Borrero tried to move away."  (*Id.* ¶¶ 431, 434–35);

- On January 19, 2018, at the Managers' Outing, Kim laid his head on Borrero's shoulder, told her he loved her, and later put his hands around her and Dunleavy. Kim announced, "No, [Borrero] is leaving with me" after a co-worker asked if she would leave with a different employee.  (*Id.* ¶¶ 443, 445–46, 449.)

In total Borrero complains of incidents that occurred on seven different days over the span of 11 months.  Collectively, these are not sufficiently pervasive to support a hostile work environment

---

[8] While the pervasive inquiry must not be conflated with the severe inquiry, the Court is not required to credit instances of conduct that are not objectively inappropriate.  *See Alfano v. Costello*, 294 F.3d 365, 376 (2d Cir. 2002) ("remov[ing] from the equation" incidents that "support no inference of mistreatment"); *see also Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 480 (S.D.N.Y. 2008) ("Merely inviting a female colleague to socialize after work patently fails to rise to the level of sexual overture."), *aff'd*, 354 F. App'x 559 (2d Cir. 2009).  Thus, the Court removes from consideration the December 30, 2017 dinner during which "[n]ot too much [happened] because [Borrero] stayed there only for like 30 minutes . . . . and [Kim] asked [Borrero]—about the case [of the Hotel employee], what she was going through."  (Defs.' Reply 56.1 ¶ 228.)  The Court likewise will not consider the September 2017 incident because Borrero testified that Kim did not say anything inappropriate to her, and she provided no details concerning the alleged touching that occurred for the Court to analyze.  (*Id.* ¶ 441.)

claim.[9]  *See, e.g.*, *Hsueh*, 2017 WL 3671179, at \*5 (summary judgment granted despite more than fifteen incidents over seven-month period); *Holohan v. Newmark & Co. Real Estate, Inc.*, No. 18-CV-6275, 2019 WL 4743883, at \*3 (S.D.N.Y. Sept. 16, 2019) (plaintiff failed to state a claim where "incidents of sexual harassment [were] alleged to have occurred over a period of several months, with roughly two to three incidents per month"); *McKenna v. VCS Grp. L.L.C.*, No. 08-CV-1563, 2009 WL 319879, at \*5 (D. Conn. Sept. 30, 2009) (plaintiff failed to state a claim despite "not less than fifteen (15) occasions" over the course of seven months where supervisor commented on plaintiff's cleavage); *Chauca v. AdvantageCare Physicians, P.C.*, No. 18-CV-2516, 2019 WL 4247495, at \*7–8 (E.D.N.Y. Sept. 6, 2019) (granting summary judgment for defendant despite multiple inappropriate comments and suggestive gestures).

Likewise, the incidents Borrero describes are not sufficiently severe to avoid dismissal. As to her allegations concerning physical touching, Borrero alleges only "casual contact that might be expected among friends."  *See Redd*, 678 F.3d at 177.  That is, she does not allege "physical conduct of a sexual nature" that is actionable under Title VII.  *Cf. Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 655–56 (E.D.N.Y. 2015) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) (demeaning sexual proposals to plaintiff involving money and direct contact with plaintiff's buttocks were sufficiently severe); *Adams v. City of New York*, 837 F. Supp. 2d 108, 117, 125 (E.D.N.Y. 2011) (conduct was sufficiently severe where supervisor pinned plaintiff to the wall, tried to kiss her, and refused to let go of her, and in another incident, made plaintiff sit on his lap, tried to kiss her, and removed his pants)  Nor does Borrero allege "intimate or crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the

---

[9] To be sure, Borrero claims that Kim invited her to drinks many times.  But, an invitation to drinks without more is not insufficient.  *See Manko*, 554 F. Supp. 2d at 480 ("Merely inviting a female colleague to socialize after work patently fails to rise to the level of sexual overture.").

buttocks[]" which might be actionable when they repeatedly occur.  *See Redd*, 678 F.3d at 177

(citation omitted).  Moreover, the casual contact between Kim and Borrero—Kim hugging her

on two occasions and laying his head on her shoulder on one occasion—is not coupled with any

aggravating circumstances like continued contact after an objection.  *Id.*  Accordingly, none of

the touching incidents are sufficiently severe to be actionable under Title VII.  *See e.g., Vito v.*

*Bausch & Lomb Inc.*, 403 F. App'x 593, 596–97 (2d Cir. 2010) (affirming summary judgment

where plaintiff alleged a co-worker pushed against the back of plaintiff's chair and touched part

of her back and side, and touched plaintiff's shoulder on two separate occasions); *Figueroa*, 109

F. Supp. 3d at 552–53 (claim dismissed involving thigh touching that was not sexual in nature);

*Hsueh,* 2017 WL 3671179, at \*\*4–5 (claim dismissed involving arm grabbing and kiss on the

cheek).

Kim's alleged comments are likewise insufficiently severe to be actionable.  Kim

commented on Borrero's weight-loss and his apparent love for Borrero.  Although certainly

inappropriate for a workplace, Kim's conduct toward Borrero amounts to no more than "offhand

comments [and] isolated incidents of offensive conduct" that cannot support a claim of

discriminatory harassment.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004).  Indeed,

courts have dismissed claims based on comments that are significantly more severe than those

claimed here.  For example, in *Geller v. North Shore Long Island Jewish Health System*, a

"variety of comments about [plaintiff's] breasts" and a "drawing of a penis on a whiteboard

during a meeting" were insufficiently severe.  *See* 2013 WL 5348313, at \*7.  In *Chauca v.*

*AdvantageCare Physicians*, summary judgment was granted against the plaintiff despite a

coworker making multiple inappropriate comments to plaintiff including that he could tell how

much she weighed if she sat on his lap, asking if she had punished her husband the night before,

and asking if plaintiff's fiancé had kept her up late the night before.  *See* 2019 WL 4247495, at
*2, *8.  Similar to these cases, while Kim's comments were inappropriate, they cannot be
deemed severe as a matter of law.

The cases on which Borrero relies in support of her claim are inapposite.  For example,
Borrero attempts to liken her facts to those in *Gallagher v. Delaney*, but the conduct there was
comparatively more severe than in the instant case.  There, over the course of three years, the
plaintiff's supervisor consistently complimented her appearance, gave her gifts, and invited her
on trips to Atlantic City.  *See* 139 F.3d 338, 344–45 (2d Cir. 1998).  And, the plaintiff's
supervisor not only consistently invited her to dinner, he also "ordered" her to eat dinner with
him on multiple occasions.  *See id.* at 343.  There is no evidence here that Kim ever forced
Borrero to go to dinner, gave Borrero gifts, or invited Borrero to go on trips.  Even more easily
distinguishable is *Stella v. Brandywine Sr. Living, Inc.*, No. 11-CV-1094, 2012 WL 3764500
(E.D.N.Y. Aug. 27, 2012).  There, among other incidents, the supervisor took the plaintiff in the
supervisor's office, closed the door, and directed the plaintiff to put on a shirt to "look good for
her."  *Id.* at *2.  The supervisor also bent down, pushing her buttocks toward the plaintiff in a
"suggestive manner," and approved a time-off request by saying, "I'll approve it but just
remember, I'll take care of you if you take care of me."  *Id.*  Additionally, the supervisor, in an
office with the door closed, rubbed Plaintiff's "inner thigh between the knee and groin."  *Id.*
These "alleged incidents, which included ambiguous, if not overtly sexual, comments and
unwelcome touching" are different in kind from Kim's alleged conduct.  *See id.* at *3.  The
conduct of which Borrero complains is, at most, ambiguous, and because it occurred sporadically
over a period of eleven months is neither severe nor pervasive.

28

### A.  Quid Pro Quo[10]

*Quid pro quo* sexual harassment occurs "when submission to or rejection of improper or unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual." *Clarke v. Pacifica Found.*, 07-CV-4605, 2011 WL 4356085, at *9 (E.D.N.Y. Sept. 16, 2011) (citations and internal punctuation marks omitted).  A plaintiff asserting a *quid pro quo* claim under Title VII must prove both that she was subjected to unwelcome sexual advances and that an explicit alteration in the terms or conditions of employment resulted from her refusal to submit to such sexual advances.  *Id.*; *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006).  "A tangible employment action usually 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Schiano*, 445 F.3d at 604.

### 1.  Capaldo's Quid Pro Quo Theory

Defendants argue that Capaldo cannot succeed on his *quid pro quo* theory because the adverse employment actions he suffered were the culmination of many months of job performance issues, including the insubordination that led to his termination, and not any sexual advances.  (Defs.' Reply at 2–3.)  In support, Defendants point out that Capaldo's job

---

[10] Defendants invite the Court to dismiss Borrero and Capaldo's *quid pro quo* sexual harassment claims on the grounds that they each failed to assert separate causes of action for hostile work environment and *quid pro quo* in the amended complaint, and because they failed to raise a *quid pro quo* claim in their EEOC complaints.  (Defs.' Reply at 1–2.)  The Court declines to do so.  A fair reading of the complaint reveals that Plaintiffs "set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." *Kearney v. Cnty. of Rockland*, 373 F. Supp 2d 434, 441 (S.D.N.Y. 2005), *aff'd sub nom. Kearney v. Cnty. of Rockland* ex *rel. Vanderhoef*, 185 F. App'x 68 (2d Cir. 2006).  The cases on which Defendants rely involve instances where plaintiffs asserted entirely new claims or facts supporting new claims.  That is not the case here, where plaintiffs seek to prove sexual harassment through either a theory of hostile work environment or quid pro quo.  *See Bracci v. N.Y.S. Dep't of Corr. Servs.*, No. 01-CV-01300, 2005 WL 2437029, at *5 (N.D.N.Y. Sept. 30, 2005).  Defendants' argument that Borrero and Capaldo failed to exhaust their *quid pro quo* claims also fails because Defendants failed to provide a copy of the EEOC charges from which the Court can assess the argument.

performance issues predated Capaldo's PIR (Defs.' Reply 56.1 ¶¶ 43–46); that Capaldo's PIR was extended in December 2017 because his performance did not improve (*id.* ¶¶ 47–50); that Capaldo informed Morales that Kim and Dunleavy met with Capaldo about his poor performance once per month for six months prior to January 2018 (*id.* ¶¶ 47, 51, 482); that Kim had planned to terminate Capaldo's employment as early as January 2018 (*id.* ¶ 56); and that Capaldo had not inspected rooms himself as instructed, which constituted insubordination (*id.* ¶¶ 155–57.)   Defendants' evidence of Capaldo's poor performance is sufficient to demonstrate a legitimate, nondiscriminatory reason for his suspension. *See Morris v. N.Y.C. Health & Hosps. Corp.*, No. 09-CV-5692, 2018 WL 4762247, at *13 (E.D.N.Y. Sept. 30, 2018) ("poor performance" was a legitimate nondiscriminatory reason for plaintiff's termination).  This does not end the Court's inquiry, however.

Capaldo has presented evidence sufficient to create a triable issue of fact as to whether his poor performance and insubordination were mere pretext for discrimination.  That is, Capaldo presented evidence that Kim fabricated the Anderson Statement in an effort to have Capaldo terminated, and Obomeghie and Morales unreasonably relied upon the Statement in their decision to terminate him for insubordination.  Specifically, Anderson testified that the signature appearing on the Statement is not his, and Capaldo claims that both Obomeghie and Morales relied upon the Statement in their decision to terminate him.[11]  In response, Defendants seek to downplay the significance of this discrepancy, arguing that "Obomeghie and Morales exercised independent judgment in suspending and terminating Capaldo . . . and reasonably believed that Capaldo was insubordinate based on his long history of job performance counseling

---

[11] Defendants ask the Court to ignore Capaldo's evidence of forgery because, according to them, Anderson's testimony is not credible.  (Defs.' Mem. at 7 n.3, 26).  Once again, they disregard the well-established rule that credibility determinations are for the jury, not the Court.

and the key lock interrogation reports." (Defs.' Reply Mem. Supp. Mot. Summ. J. ("Defs.' Reply") at 11, ECF No. 77.)  But, Obomeghie's testimony suggests that absent the Anderson Statement, he would not have exercised his discretion to call for Capaldo's termination. Obomeghie testified in his deposition that when he received the Reports from Kim, he told Kim "we need to get a statement" from Anderson.  (Ex. H at 89:24–90:4, Warsaw Decl., ECF No. 70-8.)  And, when asked about the Capaldo's suspension, Obomeghie testified in his deposition that, even after receiving the Reports and with knowledge of Capaldo's poor performance, "we needed to have [Anderson] do a written statement to have it in the record."  (*Id.* at 95:11–13.) Indeed, Obomeghie did not recommend Capaldo's suspension and termination upon receipt of the Reports.  Instead, he did so only after Kim told him that Anderson confirmed Capaldo was not inspecting rooms.  (*See* Ex. N, Goldring Decl., ECF No. 76-14.)

Temporal proximity between the rejection of sexual advances combined with "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons" is sufficient for a *quid pro quo* claim to survive summary judgment.  *See Messer v. Fahnestock & Co. Inc.*, No. 03-CV-04989, 2008 WL 4934608, at **16–17 (E.D.N.Y. Nov. 18, 2018) (quotation omitted) (denying summary judgment as to *quid pro quo* claim where plaintiff demonstrated contradiction in proffered reason for termination, which occurred two months after rejection of sexual advance).  Capaldo was suspended and terminated less than two months after he rejected Kim's sexual advance at the Managers' Outing. And, Capaldo has established that Defendants' proffered reason is seemingly inconsistent and contradictory.  Accordingly, there is a triable issue of fact as to whether Defendants' proffered

31

reason for Capaldo's suspension and termination is pretext for discrimination, precluding summary judgment.[12]

### 2. Borrero's Quid Pro Quo theory

Defendants argue that Borrero failed to establish a *quid pro quo* claim because Kim's "alleged invitation and compliments, without more do not show an unwelcome sexual advance." (Defs.' Reply at 3.)  The Court agrees.  It is axiomatic that, to be actionable, the complained of conduct supporting a *quid pro quo* discrimination claim must be sexual in nature.  *See Karibian*, 14 F.3d at 777 ("[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct . . .").  Borrero's evidence of sexual advances include Kim's comments that he loved her, that she was beautiful, and that she lost weight.  But, none of these comments can be deemed an "advance."  Borrero also highlights Kim's invitations to drinks after work, but such invitations, "without any other evidence that suggests the invitations were sexual in nature or made due to a plaintiff's gender is insufficient to establish a *prima facie* case of *quid pro quo* sexual harassment."  *Morris*, 2018 WL 4762247, at **8–9  (no *quid pro quo* claim despite plaintiff's allegation that defendant invited him to dinner which plaintiff perceived to be a sexual advance).  Borrero has failed to produce any such

---

[12] Capaldo also claims that the PIRs support his quid pro quo theory because Kim prepared "a false paper trail to justify termination" after Capaldo rejected Kim's attempted kiss.  (Pls.' Opp'n at 8.)  In support, Capaldo points to the December 15, 2017 extended PIR, which he claims he never received, and Kim's January 13, 2018 email to Obomeghie advising that Kim was "currently working to make a change" concerning Capaldo's employment.  (*Id.*)  But, other than timing, Plaintiff offers no evidence that Defendants' legitimate, nondiscriminatory reasons for these actions (i.e., Capaldo's documented performance issues) were pretext.  *See Messer v. Fahnestock & Co. Inc.*, No. 03-CV-04989, 2008 WL 4934608, at *16 (E.D.N.Y. Nov. 18, 2008).  Capaldo's assertion that the December 2017 extended PIR paperwork was "false" is belied by the facts.  Regardless of whether he received the document, Capaldo admits that he discussed the topics in the December 2017 extended PIR.  (*See* Defs.' Reply 56.1 ¶ 49.)  Moreover, Capaldo does not, and cannot, dispute that Kim and Dunleavy disapproved of Capaldo's performance for months prior to Kim's January 2018 email to Obomeghie, and critically, prior to any sexual harassment.  Indeed, in his complaint to Morales, Capaldo reported that starting in July 2017, Kim and Dunleavy met with him once per month for six months, threatening him in each of those meetings with termination.  (Ex. E at 1, Goldring Decl., ECF No. 76-5.)  Capaldo has failed to demonstrate that Defendants' legitimate, nondiscriminatory reasons for the extended PIR and Kim's January 2018 attempt to terminate Capaldo are pretextual.

evidence.  She has presented no evidence, for example, that Kim's invitations included sexual innuendo, that he suggested they go to a location typically associated with sex, or that, when she accepted his invitation, anything of a sexual nature occurred.  To the contrary, Borrero's evidence establishes that when she went to drinks with Kim in December 2017, Kim discussed nothing sexual at all.  (Defs.' Reply 56.1 ¶¶ 228–29, 437–38.)  Next, even if Kim's conduct could be deemed sexual in nature, Defendants are correct that Borrero has failed to "present evidence . . . that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."  *Morris*, 2018 WL 4762247, at *7 (quoting *Karibian*, 14 F.3d at 777).  Indeed, Borrero's assertion that Kim linked removal from the action plan to going out to drinks after work is belied by the fact that Kim took Borrero off the action plan hours before he asked her to get drinks.  That Kim did not put Borrero back on the action plan after she rebuffed his invitation confirms that the employment action and declination of Kim's invitation were not linked.  (Defs.' Reply 56.1 ¶¶ 213–219.); *See Schiano*, 445 F.3d at 604 (no *quid pro quo* harassment where plaintiff received a raise, rather than punishment, after refusing supervisor's advance).  Moreover, Borrero's deposition testimony demonstrates that she routinely rejected Kim's invitations to drinks before he took her off the action plan (Ex. GG 98:17–22, Goldring Decl., ECF No. 76-33.), and even after she acquiesced to drinks, she faced no adverse consequences when nothing sexual was requested or occurred.  Thus, it cannot be said that a tangible employment action resulted from Borrero's refusal to submit to Kim's advances.  *See Schiano*, 445 F.3d at 603; *see also Brown v. City of New York*, No. 10 Civ. 6491, 2011 WL 2693677, at *8 (S.D.N.Y. July 11, 2011) (dismissing *quid pro quo* harassment claim where alleged adverse action "preceded the first alleged incident of sexual harassment"); *Figueroa v. RSquared NY, Inc.*, 89 F. Supp. 3d 484, 491 (E.D.N.Y. 2015)

(acknowledging that the sexual advance should "precede[]" the tangible employment action for actionable *quid pro quo* claim).[13]

Accordingly, Borrero's sexual harassment claim premised upon a *quid pro quo* theory must be dismissed.

## II.   Retaliation under Title VII

Title VII makes it unlawful "for an employer to discriminate against any . . . employee[] . . . because [the employee] has opposed any practice made an unlawful employment practice . . ., or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . ." 42 U.S.C. § 2000e-3(a).  On a motion for summary judgment, retaliation claims are analyzed under the three-step burden shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005)).  "First, the plaintiff must establish a *prima facie* case of retaliation by showing: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Id*. (quoting *Jute*, 420 F.3d at 173).  The *prima facia* burden is "*de minimis*" and the question for the Court is solely whether the plaintiff's admissible evidence would be sufficient to infer retaliatory motive.  *See id*.

Once a *prima facie* case is established, a presumption of retaliation arises that the defendant may rebut by adducing evidence of a legitimate, non-retaliatory reason for the adverse employment action.  *See Hicks*, 593 F.3d at 164.  Importantly, "the defendant need not persuade

---

[13] Borrero's argument that Kim linked a tangible job benefit to "being out with him socially" is insufficient because the tangible job benefit needs to be linked to "unwelcome sexual conduct."  *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994).

the court that it was actually motivated by the proffered reasons [because] it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [retaliated] against the plaintiff." *Flanagan v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-5246, 2014 WL 4905124, at *9 (E.D.N.Y. Sept. 30, 2014) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)).  If a defendant successfully rebuts the presumption of retaliation, the burden shifts back to the plaintiff to demonstrate that "'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause.'" *Hicks*, 593 F.3d at 164 (quoting *Sumner*, 899 F.2d at 209).

### 1. Capaldo's Retaliation Claim

In urging dismissal of Capaldo's retaliation claim, Defendants do not meaningfully argue that Capaldo failed to establish a prima facie case.  Nor could they.  Capaldo engaged in protected activity on January 25, 2018, when he provided a written statement to Morales, Kim knew of Capaldo's complaint, and Capaldo was terminated five weeks later.[14]

Defendants' primary argument is that Capaldo's insubordination was a legitimate, non-retaliatory reason for his termination.  (*See* Defs.' Mem. at 25–26.)  Defendants point to documentary evidence, including a "note to file," "memo of concern," and "three PIRs," demonstrating that "Capaldo's discipline was part of a progressive, gradual response to his job

---

[14] A plaintiff can establish but for causation at the *prima facie* stage by "showing that the protected activity was closely followed in time by the adverse employment action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).  Capaldo has established that here because only five weeks separate his termination from his protected activity.  Defendants argue that "Capaldo's failure to obey Kim's direction breaks the causal connection between his complaint and termination" (Defs.' Mem. at 24.), but whether Capaldo disobeyed Kim's direction is a disputed fact.  (*See* Pls.' Mem. at 23.)  And, in each of the cases cited by Defendant, it was undisputed that the employee engaged in conduct that broke the causal chain.  *See Mauze v. CBS Corp.*, No. 15-CV-4950, 2019 WL 8137641, at *3 (E.D.N.Y. Jan. 23, 2019) (plaintiff admitted to insubordination); *Lytle v. JPMorgan Chase*, No. 08 Civ. 9503, 2012 WL 393008, at *34 (S.D.N.Y. Feb. 8, 2012), *report and recommendation adopted*, 2012 WL 1079964 (S.D.N.Y. Mar. 30, 2012) (plaintiff did not dispute that he engaged in conduct that led to his termination); *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765, 2012 WL 1901199, at *11 (S.D.N.Y. May 21, 2012) (evidence of plaintiff's insubordination was "undisputed").

performance issues that started well before any protected activity." (*Id.*)  This is sufficient to rebut the presumption of retaliation.

Still, Capaldo has presented evidence that his discharge was retaliatory.  That is, as with his *quid pro quo* sexual harassment claim, Capaldo presented evidence that Kim provided a forged Statement concerning Capaldo's insubordination to the ultimate decisionmakers, and that the Statement was necessary for the ultimate decision to terminate Capaldo.  Accordingly, Defendants' motion for summary judgment as to Capaldo's retaliation claim is denied.[15]

### 2.  Borrero's Retaliation Claim

Defendants argue that Borrero has failed to establish a *prima facie* case of retaliation because she has not established an adverse employment action or constructive discharge.  (*See* Defs.' Mem. at 27–28.)  The Court agrees.

A plaintiff alleging retaliation need only show "that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Hinton v. City Coll. of N.Y.*, No. 05-CV-8951, 2008 WL 591802, at *24 (S.D.N.Y. Feb. 29, 2008) (quoting *Burlington v. Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  Still, a plaintiff must establish conduct "that produces an injury or harm.'"  *Shultz v. Congregation Shearith Israel of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Tepperwien v. Entergy*

---

[15] Defendants' cases to the contrary are inapposite because none involves evidence that the retaliator fabricated evidence and infected the decision-making process.  *See Spadola v. N.Y.C. Transit Auth.*, 242 F. Supp. 2d 284, 294–95 (S.D.N.Y. 2003) ("[Plaintiff] presents no evidence that casts any doubt on the impartiality of the arbitrator or that otherwise suggests that the fairness of the arbitration proceeding was compromised."); *Vitale v. Equinox Holdings, Inc.* No 17-CV-1810, 2019 WL 2024504, at *12–13 (S.D.N.Y. May 7, 2019) (no evidence of weakness in defendants' proffered reason for termination); *Ascione v. Pfizer, Inc.*, 312 F Supp. 2d 572, 579 (S.D.N.Y. 2004) ("The Court notes, moreover, that the review was conducted by employees within Pfizer's Corporate Security department, not by any of the decisionmakers alleged to have unlawfully discriminated against [plaintiff]."); *Flanagan v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-5246, 2014 WL 4905124, at *12 (E.D.N.Y. Sept. 30, 2014) (plaintiff provided no proof that the evidence supporting his termination was "manufactured or contrived").

*Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011)).  Accordingly, as a general matter, "excessive scrutiny is not an actionable adverse employment action." *Thomson v. Odyssey House*, 652 F. App'x 44, 46 (2d Cir. 2016); *Guity v. Uniondale Union Free Sch. Dist.*, No. 12-CV-1482, 2014 WL 1330636, at *19 (E.D.N.Y. Mar. 31, 2014) (adopting report and recommendation that collected cases establishing "increased or heightened surveillance of an employee does not necessarily constitute a 'materially adverse' employment action.").  To be sure, minor acts like increased surveillance can constitute retaliation when they reach a "'critical mass' of frequency and severity."[16]  *Hoover v. Cnty. of Broome*, 340 F. App'x 708, 710 (2d Cir. 2009) (quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)).  But, such incidents must "occur often and over a long period of time."  *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 265 (E.D.N.Y. Jan. 6, 2012); *see, e.g., Corrado v. New York State Unified Ct. Sys.*, No. 12-CV-1748, 2014 WL 4626234, at *3 (E.D.N.Y. Sept. 15, 2014) (allegation of increased scrutiny over an eight-month period coupled with allegations of "unreasonable" workloads and "negative performance evaluations" over separate seven-month period constituted harassment); *Khazin v. City of New York*, No. 17-CV-3779, 2020 WL 13518233, at *12 (E.D.N.Y. Jan. 29, 2020) (allegations of "three year stretch during which plaintiff was allegedly scrutinized by his superiors, forced to work holidays, and deprived of overtime" combined with allegations of unsupported disciplinary action established adverse action).

Here, Borrero claims that after she engaged in protected activity, Dunleavy was critical in an email; Kim began revising the housekeeper schedules she prepared; Kim started copying HR

---

[16] Though *Hoover v. County of Broome*, 340 F. App'x 708 (2d Cir. 2009) concerns First Amendment retaliation, the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern [and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)]." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006).

on every email to her; Dunleavy started reviewing Borrero's room inspections; and she received an expectation memo, which she does not dispute was non-disciplinary.[17]  Even viewed in the light most favorable to Borrero, these employment actions amount to nothing more than increased workplace scrutiny occurring over a three-month period that did not result in any discipline or discharge, and is too minor to establish injurious retaliatory conduct.  *See Harper v. Brooklyn Child.'s Ctr.*, 12-CV-4545, 2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014) (two disciplinary citations and a counseling memorandum, without more, were insufficient to make out *prima facie* case of retaliation).

Likewise, Borrero has failed to establish that she was constructively discharged.  To prove constructive discharge, a plaintiff must adduce evidence establishing that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily."  *Santiesteban v. Nestle Waters N. Am., Inc.*, 61 F. Supp. 3d 221, 245 (E.D.N.Y. 2014) (quoting *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010)).  The standard "is something more than what is required to demonstrate a hostile work environment."  *Id.*  Here, Borrero's evidence of constructive discharge is insufficient as a matter of law.  Accordingly, it cannot support her retaliation claim.

### 3. Kohlmeier's Retaliation Claim

Defendants argue that Kohlmeier has failed to establish even a *prima facie* case of retaliation because his insubordination breaks any causal connection between his protected activity and his termination.  The Court agrees.

---

[17] Borrero also claims that Dunleavy told one of Borrero's subordinates that Borrero "should watch out, that she put the noose around [her] own neck," and that Dunleavy celebrated Kohlmeier's termination and would celebrate the termination of others who complained.  (Pls.' Opp'n at 26–27.)  But, this fact relies upon inadmissible hearsay for which Borrero offers no exception.  Accordingly, the Court will not consider it.

It is long-settled that temporal proximity between protected activity and an adverse employment action are sufficient to establish a causal connection for a prima facie case of retaliation. However, the causal connection can be broken "where an intervening event post-dating the protected conduct provides an independent basis for the adverse action." *Mauze v. CBS Corp.*, No. 15-CV-4905, 2019 WL 8137641, at *3 (E.D.N.Y. Jan. 23, 2019); *see also Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388, 2012 WL 5451189, at *13 (S.D.N.Y. Nov. 8, 2012), *aff'd* 542 F. App'x 12 (2d Cir. 2013) (plaintiff failed to create a *prima facie* case of retaliation where two weeks after protected activity, co-worker complained about plaintiff's inappropriate conduct). Here, Kohlmeier asserts that Kim "set-up" Kohlmeier by giving him an impossible directive after Kohlmeier engaged in protected activity. (Pl's Opp'n at 32–33.) When Kohlmeier failed to follow that directive, Kim deemed him insubordinate, leading to Morales and Obomeghie terminating him. (*Id.*) But, Kohlmeier does not dispute that Kim's directive was within Kim's authority. (Defs.' Reply 56.1 ¶ 375.) And, Kohlmeier does not dispute that he did not follow the directive or respond to Kim explaining why he purportedly could not follow it until after Kim discovered that Kohlmeier had not followed it. (*Id.* ¶¶ 369–71.) Thus, Kohlmeier's undisputed insubordination breaks any causal connection between his protected activity and termination. *See Mauze*, 2019 WL 8137641, at *3 (holding that plaintiff's "failure to communicate with her colleagues and to obey direct orders from her supervisor [broke] any causal connection between [plaintiff's] complaints and her termination"). Kohlmeier focuses upon the fact that Kim, who had motive to retaliate against Kohlmeier, gave him the directive, but this was of no moment in *Mauze*. *See id.* at *1, *3 (plaintiff complained about supervisor, and supervisor provided directive that plaintiff disregarded, thereby breaking the causal chain). Kohlmeier also focuses upon the fact that Kim typically did not change

Kohlmeier's schedule, but he acknowledges that five percent of the time, Kim would change the schedule.  (*See* Defs.' Reply 56.1 ¶ 548.)  And, Kohlmeier did not testify that he attempted at all to comply with Kim's directive, as he was required to do under the Hotel's policy.

Even if Kohlmeier had established a *prima facie* case of retaliation, he failed to establish that Defendants' legitimate, nonretaliatory reason was pretextual.  That is, Kohlmeier failed to establish that Morales' and Obomeghie's determination of insubordination was pretext for retaliation.  Kohlmeier relies upon a cat's paw theory of liability, which requires proof that the decisionmaker "act[ed] negligently with respect to the information provided by the [retaliatory] employee, and thereby afford[ed] that [retaliatory] employee an outsize role in its own employment decision."  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016) (emphasis omitted).  For the same reasons he failed to establish causation, he cannot establish that Morales and Obomeghie unreasonably determined that Kohlmeier was insubordinate.  That is, because Kohlmeier indisputably failed to even attempt to follow Kim's directive, Morales and Obomeghie's independent conclusions that Kohlmeier was insubordinate cannot be deemed to have been negligent.

## III.    Capaldo's FLSA and NYLL Claims

FLSA and NYLL exempt from overtime requirements employees who are paid a salary and work in a *bona fide* executive or administrative capacity.  29 U.S.C. § 213(a)(1).[18]  An employee is properly classified as an "executive" if (1) the employee is compensated on a salary basis; (2) the employee's primary duty is management of the enterprise or department thereof; (3) the employee customarily and regularly directs two or more other employees; and (4) the

---

[18] The NYLL incorporates the FLSA overtime exemptions by reference.  *See Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010); *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 425 n.2 (S.D.N.Y. 2013).

employee has the authority to hire or fire other employees, or if suggestions and recommendations on personnel decisions are given particular weight.  29 C.F.R. § 541.100(a).  An employee is properly classified as "administrative" if (1) the employee is compensated on a salary basis; (2) the employee's primary duty is performance of office or non-manual work directly related to the management or general business operations or customers; and (3) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200.

FLSA exemptions, like the overtime exemption, are narrowly construed, and it is the employer's burden to establish their applicability.  *See Smith v. Wall St. Gold Buyers Corp.*, No. 18-CV-6836, 2021 WL 4711730, at *5 (E.D.N.Y. Sept. 20, 2021) (citing *Anani v. CVS RX Servs., Inc.*, 788 F. Supp. 2d 55, 59 (E.D.N.Y. 2011), *aff'd*, 730 F.3d 146 (2d Cir. 2013)).  And, although application of the exemption is a question of law, s*ee Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986), it is not "often susceptible to resolution on [a] motion[] for summary judgment."  *Smith*, 2021 WL 4711730, at *5 (quoting *Nunez v. Metro. Learning Inst., Inc.*, No. 18-CV-1757, 2021 WL 1176219, at *3 (E.D.N.Y. Mar. 29, 2021)).  This is so because "inquiries into employees' FLSA-exempt status are fact-intensive."  *Nunez*, 2021 WL 1176219, at *3 (quoting *Sexton v. Am. Golf Corp.*, No. 13-CV-873, 2015 WL 5884825, at *3 (E.D.N.Y. Oct. 8, 2015)).

Against that backdrop, it is clear that Defendants have failed to meet their burden to establish the applicability of the overtime exemption because they rely upon facts that are disputed.  Defendants point to evidence that Capaldo was responsible for the Hotel's physical plant, maintained the Hotel's assets, implemented the engineering department's preventative maintenance program, had five subordinates who he directed and trained, could recommend

41

hires, promotions, and terminations, prepared performance reviews, work schedules and timesheets, generated reports and action plans, delegated tasks, and was part of a program where he would serve as manager in charge of the Hotel.  (Defs.' Mem. at 29–30.)  They also argue Kim would defer to Capaldo's judgment about engineering issues, and Capaldo had regular contact and communication with Kim's boss.  (*Id.*)  But, Capaldo raises facts that, if true, establish that the exemption does not apply.  Capaldo asserts that his "chief executive" title was a misnomer, and his primary duties involved manual labor, not management.  (Pl's Opp'n 33–34.)  Capaldo disputes the amount of authority Defendants maintain he held.  Contrary to the broad authority Defendants assert, Capaldo maintains that he needed approval concerning every aspect of the department.  (Pls.' Opp'n at 33–34.)  Indeed, according to Capaldo, Kim exercised authority over material and equipment purchase decisions, employee schedules, and even Capaldo's subordinates' responsibilities.  (*Id.* at 34.)  Capaldo further asserts that his hiring and firing recommendations were not given any particular weight.  (*Id.*)  The Court cannot resolve these factual disputes, and therefore, it cannot determine the exemptions are applicable.[19]

## CONCLUSION

Defendants' motion for summary judgment as to Borrero's sexual harassment and retaliation claims is GRANTED.  Defendants' motion for summary judgment as to Kohlmeier's retaliation claims is GRANTED.  Defendants' motion for summary judgment as to Capaldo's hostile work environment claim, *quid pro quo* claim, retaliation claim, and misclassification claims is DENIED.

SO ORDERED.

Dated: March 30, 2023          /s/ LDH
      Brooklyn, NY          LASHANN DEARCY HALL

---

[19] At the end of their opening brief, Defendants request leave to submit additional briefing concerning proper defendants.  (Defs.' Mem. at 30.)  Defendants' request is denied.

United States District Judge